# Downing *v.* Woodstock Iron Company.

*Bill in Equity to have Absolute Conveyance declared Mortgage, and for Account and Redemption.*

1. *Declaring absolute conveyance to be mortgage.*—A conveyance of lands, absolute on its face, may be declared and enforced as a mortgage in equity, on parol evidence; but the evidence must be clear, consistent, strong and convincing, to authorize such a decree; and the testimony of two witnesses, as to the details of the conversation between the parties ten years before, when the alleged agreement was made, is not sufficient, the terms of the agreement itself being uncertain, unreasonable, and inconsistent with the subsequent conduct of the complainant himself.

2. *Same; at whose instance decreed.*—A court of equity will not declare and enforce as a mortgage a conveyance which is absolute on its face, at the instance of a person who was not a party to it, who parted with no title or interest in the land, and had none which he could convey; as where the lands were sold under a decree in chancery in enforcement of a vendor's lien, and the purchaser at the sale afterwards conveyed by quit-claim deed to a person who advanced the money, the deed will not be declared and enforced as a mortgage

[Downing v. Woodstock Iron Company.]

at the instance of the defendant in the decree, on averment and proof that the transaction was intended for his benefit, to give him an opportunity to redeem.

3. *Testimony of party as to transactions with deceased agent or trustee.* The complainant seeking to establish an equitable interest or trust in lands, under an oral agreement between himself and an agent or officer of the defendant corporation, can not testify as to any transactions between him and said agent or officer, since deceased (Code, § 2765); nor can he prove his declarations to a third person, as to the terms of the contract between him and said agent, when not made in the presence of the defendant, or of any person representing it.

APPEAL from the Chancery Court of Calhoun.

Heard before the Hon. S. K. McSPADDEN.

The bill in this case was filed on the 14th March, 1889, by W. P. Downing against the Woodstock Iron Company, a private corporation; and sought to have a quit-claim deed, under which the defendant held and claimed a small tract of land, declared and enforced as a mortgage, and for an account and redemption under it. The complainant had once bought the land from one Harrison, who had bought from one Alexander; but, the purchase-money not having been paid, a bill in equity was filed by Alexander to enforce his lien as vendor; and the land being sold under a decree obtained in that suit, J. & W. W. Draper became the purchasers, and received a deed from the register in chancery. The sale under the decree in chancery was made on the 7th January, 1878, and the price bid by the purchasers was $220. On the 8th May, 1878, the purchasers conveyed the land, by quit-claim deed, to the defendant corporation, on the recited consideration of $220 in hand paid; and this is the conveyance which the complainant seeks to have declared and enforced as a mortgage, on the ground that the transaction was intended for his benefit, under the circumstances stated particularly in the opinion of the court. On final hearing on pleadings and proof, the chancellor dismissed the bill, and his decree is now assigned as error.

BROTHERS, WILLETT & WILLETT, for appellant, cited *Patton v. Beecher*, 62 Ala. 594; *Parmer v. Parmer*, 88 Ala. 545; *Turner v. Wilkinson*, 72 Ala. 361; *Douglass v. Moody*, 80 Ala. 61; *Houser v. Lamont*, 55 Penn. St. 311, or 93 Amer. Dec. 755; *Carr v. Carr*, 52 N. Y. 251; *Stoddard v. Whiting*, 46 N. Y. 627; *Cox v. Ratcliff*, 105 Ind. 374; *Campbell v. Dearborn*, 12 Amer. Rep. 671, or 109 Mass.; *Crews v. Threadgill*, 35 Ala. 334; *Locke v. Palmer*, 26 Ala. 312; *Turnipseed v. Cunningham*, 16 Ala. 501; Jones on Mortgages, §§ 324-31; 3 Pom. Equity, §§ 1192-96.

KNOX & BOWIE, *contra.*—(1.) The verbal contract sought to be enforced in this case is uncertain, indefinite, unreason-

[Downing v. Woodstock Iron Company.]

able, and wanting in mutuality; and a court of equity would not enforce it, if the evidence established it with the clearness and conclusiveness required in such cases. (2.) The evidence fails to bring the case within the strict rule which governs such cases. Excluding the testimony of the complainant himself, as to transactions between him and Noble (*Savings Bank v. McDonnell*, 87 Ala. 736), and the testimony of Stocks as to the complainant's declarations when the defendant was not present, the case rests on the uncertain recollection of two witnesses, testifying to a conversation had in their presence more than ten years before. This does not satisfy the strict rule which applies in such cases, especially when considered in connection with the complainant's inconsistent conduct. *Knaus v. Dreher*, 84 Ala. 319, and cases there cited. (3.) The alleged agreement, if proved, is void under the statute of frauds.—2 A. K. Mar. 108; *Johnson v. Lamotte*, 6 Rich. Eq. 347; 5 Watts, 389; 28 Penn. St. 419.

McCLELLAN, J.—J. & W. W. Draper purchased the land in controversy at a sale made under a decree of the Chancery Court enforcing a vendor's lien in favor of Alexander against one Harrison, the vendee, and W. P. Downing, the vendee of Harrison. The price paid was $220.00, being the amount of said decree and costs, and the balance due the purchasers on a mortgage covering the land, executed by Downing to them. The purchasers took the register's deed, and satisfied their mortgage. Soon afterwards, the Woodstock Iron Company, acting through its secretary and treasurer, Samuel Noble, paid the Drapers $200 for the land, and took a quit-claim deed, absolute in form. All this occurred early in the year 1878. The present bill was filed by Downing, March 14, 1889, for the purpose of having the deed from Draper to the Woodstock Iron Company declared a mortgage from him to said company, for an account ascertaining the amount due thereon, and for redemption therefrom. It is alleged that the Drapers, as a concession to Downing, in appreciation of the hardship it was on him to have to pay a balance of purchase-money due the original vendor, after having fully paid his immediate vendor, agreed to abate their claim to the extent of $20.00, and to allow redemption on payment of the balance of $200; that Downing borrowed the money necessary to avail himself of this proposition from the Woodstock Iron Company, and to secure the re-payment of it, the company took the quit-claim deed from the Drapers, and agreed that Downing should have all the time he wanted to re-pay the principal, provided he would pay ten per cent. interest thereon annually. The pur-

[Downing v. Woodstock Iron Company.]

chase or redemption money was paid directly by the company to the Drapers.

Waiving all other considerations for the present, it will first be discussed whether the agreement between the complainant and the defendant, relied on to give to the absolute deed from the Drapers to the Woodstock Iron Company the character of a mortgage from the complainant to the defendant, is supported by the evidence. It has been over and over again said by this court, that to entitle a complainant to the relief here prayed, the testimony going to establish the essential facts must be consistent, strong and convincing.—2 Brickell's Dig., pp. 271–2, §§ 318, 323–329; 3 Brick. Dig., p. 659, § 384; *Kraus v. Dreher*, 84 Ala. 319, and citations.

The agreement, if any was made, was a verbal one. It was made, if at all, between Downing and Samuel Noble as treasurer and secretary of the defendant corporation. Noble died before the filing of the bill. Having acted in this matter as a fiduciary representative of the Woodstock Iron Company, the testimony of the complainant himself, offered to prove conversations and transactions by said Noble in the premises, can not be considered.—*Mobile Savings Bank v. McDonnell*, 87 Ala. 736.

The testimony of the witness Stocks must also be excluded. That went only to show a conversation between complainant and a third person, in which were detailed the terms of an arrangement which the complainant said he had made with the defendant through Noble, and at which neither Noble or other representative of the defendant was present. It was manifestly incompetent evidence, and can not be taken into view in reaching a conclusion upon the issue of fact involved here. The only remaining testimony as to the fact and terms of an agreement between Downing and Noble is that of Gentry and Couch. They say they were present when the arrangement was made between Downing and Noble, more than ten years before the time of giving this evidence; that complainant offered to sell the land to Noble, who declined to buy; that he then told Noble he could redeem the land from the Drapers by paying $200.00—less than they had paid for it—and asked Noble to lend him the money for that purpose; that Noble at once agreed to do so, and that Downing should keep the money as long as he wanted it, or should "pay it back when he got ready," meantime paying interest at ten per cent. *per annum;* and that, by Noble's direction, the Drapers were on the same day told by Downing to go to the office of the company, "with their papers against Downing," and get the money. There are several infirmative circumstances attaching inherently and

[Downing v. Woodstock Iron Company.]

otherwise to this testimony. In the first place, the facts testified to transpired, as we have seen, many years before these depositions were taken, and it is scarcely probable that they were accurately remembered by witnesses having no occasion to charge their memories with them. The agreement to which they depose is not a reasonable one, and not such an one as would probably have been entered into. Enough appears in this record to justify the inference that this corporation was a borrower, and not a lender of money, and that a part of its ordinary business was the purchase of land, such as that in controversy. It is not easy to believe, on the evidence of Gentry and Couch, that its general lines of business were departed from in this instance, in such sort as put it in the attitude of refusing to enter into negotiations looking to the acquisition of this land, and of volunteering to lend money to Downing, between whom and the corporation, or Noble, no such relations appear to have existed as would account for such a change of policy. Moreover, had its business been to lend money, it surpasses belief that it would have made this loan to complainant, under an agreement with him that he could keep the money as long as he wanted it. It is much more probable that these witnesses have contorted an agreement of Noble to buy the land from Drapers, subject to Downing's right of redemption upon payment of the purchase-money and ten per cent. *per annum*, in order that the latter might get the benefit of Drapers' abatement, if he should exercise his right to redeem, into the very extraordinary contract they depose to, than that this extraordinary agreement should have been in fact entered into.

The theory of the defendant, that the transaction involved only a sale to the company with the privilege of redemption in complainant, finds support also in the facts of the prior transaction between these parties in view of the register's approaching sale. Precisely the same facts are alleged and attempted to be proved in that connection, going to show that Noble agreed to lend Downing money to buy in the land, &c., as are alleged and attempted to be proved with respect to the later transaction. And yet it is clear that Noble did not understand that he was making a loan of money to be secured by a mortgage, or a deed operating as a mortgage, on the land. On the contrary, being unable himself to attend the sale, he sent a letter by Downing to his attorney, directing him to buy the land in a certain event, and have title made to the company, and stating, "We buy the place so as to accommodate Mr. Downing, so as to give him a chance within two years to redeem it." Then, too, the subsequent conduct of the parties

[Downing v. Woodstock Iron Company.]

tends to support defendant's theory.   Complainant continued
in possession only two years—the time during which he might
have redeemed—and then of his own motion abandoned the
land.    This can not be satisfactorily accounted for upon any
other hypothesis than that he supposed he had no longer any
interest in it.    Granting there was a necessity for him to take
up his residence at another place only three-fourths of a mile
distant, it by no means follows that such necessity also involved
the abandonment of this land.   His possession might well
have been maintained by him in person, though his residence
was elsewhere, or through a tenant.    It is not to be supposed
that he would have surrendered possession of a tract of land
so valuable as he says this was—worth from $800 to $1,300
more than the incumbrance upon it—without more reason
than he shows for that course.    A sufficient reason therefor is
found in the theory of defendant, that he had no rights in
respect to the land after the lapse of the statutory period for
redemption.    True, he says he paid the ten per cent. interest
for the first two years; but he admits paying more than that
sum; and while he seeks to account for the excess in the state-
ment that it went to pay certain expenses incurred by defend-
ant in the transaction between it and the Drapers, he fails to
show that there was any contract that he should pay such ex-
penses, or that any such expenses were in fact incurred.    It is
much more reasonable that his payments for the two years of
his occupancy was made as rent for the use of the land, and
not as interest for the use of the money.    Then, too, the com-
plainant took no steps to assert his right to redeem as from a
mortgage, for more than ten years after that right accrued, if
it ever existed, nor until after the death of Noble; and no
adequate reason consistent with the claim he now advances is
attempted to be given for this long delay, and submission to
the uninterrupted possession of the defendant.    The fact that
the land was of greater value than was paid by the defendant
to the Drapers, is of no consequence whatever as tending to
show the transaction was a mortgage as between Downing and
the company, in view of the further consideration that the
title acquired by the company was for two years subject to
divestiture through a redemption by Downing. .

Another consideration of an infirmative character against
the agreement upon which complainant relies is this :   That
agreement, according to Couch and Gentry, was made early in
February, 1878, and Drapers were at once told of it, and
directed to go to the office of the defendant and get the money.
It was natural that they should want this money at once—
indeed, their agreement to abate their claim must have been

made with a view to speedy payment of the reduced amount. Yet it appears that the matter was not consummated between them and the company until three months later. There is thus no satisfactory assurance that the transfer was made in consonance with the alleged agreement, if it was really made. But, however that may be, we concur with the chancellor that the evidence is not sufficiently "strong, consistent and convincing" to justify a declaration that the deed from the Drapers to the Woodstock Iron Company was and is a mortgage from Downing to said company.

Whether, if the agreement relied on had been established by the testimony, the relief prayed could be granted, we need not decide. It would seem not, however. Downing in reality had no title whatever in the land, but a mere privilege of purchasing it—a right to redeem, which is not property, and can not be the subject of sale and transfer. He had no interest, which the Woodstock Iron Company could have acquired from him directly, or through the Drapers. He was not the grantor of the company, nor was any title of his, legal or equitable, passed by the conveyance to the company. The language of BRICKELL, C. J., would seem to fully apply to the case, and the principle announced by him to deny the relief prayed. He says: "The condition which gives to a conveyance the character of a mortgage, is matter of agreement between the grantor and the grantee, and is reserved for the benefit of the grantor. If there is an agreement between them, and no condition upon which the conveyance is defeasible, whatever may be the trust with which the estate of the grantee is charged in favor of others, not parties to the conveyance, it is not a mortgage."—*Micou v. Ashurst*, 55 Ala. 607, 615; *Moseley v. Moseley*, 86 Ala. 289.

The case of *Parmer v. Parmer*, 88 Ala. 545, is clearly distinguishable, as well from the case at bar as from those cited last above. In equity, Parmer, the complainant, had a perfect title to the land; the conveyance was made at his instance, and to secure his debt, and he was therefore the real grantor—all the title, equitably considered, which the defendant held came from the complainant, and the stipulations between the parties were the stipulations of the real grantor and grantee, and for the benefit of the former. Here, as we have seen, Downing, neither at law nor in equity, had anything to grant, directly or indirectly, and granted nothing. He was in no sense the grantor of the defendant, whether the transaction was, in effect, an absolute sale or upon conditions; and the conveyance by the Drapers to the company can not be de-

clared a mortgage by him, without violence to the decisions cited.

The decree of the chancellor is affirmed.